UNITED STATES BANKRUPTCY COURT        FOR PUBLICATION
WESTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------

In re

256-260 Limited Partnership        Case No. 14-11582 K

              Debtor

-------------------------------------------------------------------

## OPINION AND ORDER

Two questions are presented by a creditor's Objection to Confirmation of a proposed Chapter 11 Plan, and by that creditor's Motion to Lift Stay to permit a foreclosure sale of one of the Debtor's three parcels of real estate.

(1) May a downstream owner of mortgaged land use Chapter 11 to "cure" the defaults of prior owners (who were insiders), and to "modify" a fully-matured mortgage debt by stretching it out for 10 more years at a *Till* rate of interest?  (And does it matter that the <u>creditor</u> is a downstream owner of the mortgage lender's rights?)

(2) If it may do so, what is "fair and equitable treatment" of such a creditor?[1]

## INTRODUCTION

There is a difference between a "lender" and someone who purchases a

---

[1] The property at issue is a two-unit residential dwelling that can earn $600/unit/month.  Its assessed value is $68,687 as against a debt of about $112,500.  The creditor is Extraco.  After $6670 of property tax liens that prime Extraco's mortgage, Extraco's secured claim of about $66,000 is proposed to be paid in full at 4% over the course of 10 years.  Its unsecured deficiency claim will be paid at 13 cents on the dollar beginning on the 50th month.   The mortgage term was 15 years beginning in 1995.  Other details are provided below.

lender's right to collect the subject debt either *in personnam* or *in rem*. There is "privity of contract" between a lender and a borrower whether genuine negotiations actually occur or not.  Black's Law Dictionary (10th Ed.)  defines "privity of contract" as "The relationship between parties to a contract, allowing them to sue each other but preventing a third party from doing so."   When the debt is secured by a mortgage lien, and the mortgagee sells its rights, there typically will be an assignment of such rights to the buyer.  In New York, the mortgagor/borrower can sell the real estate subject to the rights of the mortgagee, but remains liable on the debt unless the lender agrees otherwise.  In two prior opinions in this District (one in this Court and the other in the District Court) it was held that where one has acquired the mortgaged real estate from the original borrower (or from an intermediate downstream owner) an attempt to utilize Chapter 11 or 13 seeking to "cure" the previous owner's default by spreading missed payments over time, or otherwise by "modifying" the mortgage note over the objection of the original lender, must fail.[2]  Not because of lack of "privity," but because notions of "cure" and "reinstatement" bespeak statutory privileges accorded to a borrower who defaulted, not privileges available to someone who acquires the property after the default.  (See *In re Parks* 227 B.R. 20 (Bankr. W.D.N.Y. 1998) and in re *Pescrillo* 2015 WL 417659 (W.D.N.Y. 2015), wherein the objecting creditors were the original lenders.).

In this Chapter 11 case we have neither the lender nor the borrower.  The

---

[2]"Cure" is § 1123(a)(5)(G).  "Modification" is § 1123(b)(5).

mortgage loan originated in 1995.  The lender sold its rights years ago, and then those

rights changed hands several times until the secured creditor here, Extraco, acquired

them in October of 2011.  The mortgage was in foreclosure at that time; no mortgage

payments had been made since 2006, according to Extraco's counsel.  The mortgage

borrower, Mr. DiGiulio, deeded the property in 1996 to a company he controlled,

"Eagle," and then in 2003, he caused Eagle to convey the property to "Zotar" (an

affiliate of both DiGiulio and this Debtor).  Finally, on December 30, 2010, Zotar

conveyed the property to the Debtor, a Limited Partnership from another state, of which

DiGiulio is a principal.  The mortgage instrument did not forbid conveyances of the land

without permission of the holder of the mortgage lien, but even if it did, in New York that

fact might not impair the validity of the transfers.  Extraco argues that the title transfers

were "improper, . . . in contravention of the Note and Mortgage," but it does not

challenge the Debtor's title.[3]

          As noted above, the debt fully matured back in 2010 and according to

Extraco's counsel, no payments have been made on the loan since 2006, and Extraco

objects to this Plan (and seeks lift of stay to continue foreclosure), arguing (1) that it

cannot be "forced" to become a "lender" on this fully-matured obligation because (A) it

and this Debtor are not in "privity of contract," and (B) the Debtor acquired title in

violation of the mortgage; or, alternatively, (2) the plan is not "fair and equitable" toward

---

[3]In other words, Extraco complains that the transfers violated the mortgage instrument, but not the conveyancing law of this State.  (Even the former is not supported by the document itself, as the Debtor has pointed out with emphasis.)

Extraco (11 U.S.C. § 1129(b)).

For its part, the Debtor argues that Extraco "bought-in" on a defaulted mortgage debt after title to the real estate had been transferred, of record, to this Debtor.  Extraco should not benefit from its lack of due diligence (the Debtor argues). (Extraco's counsel informed the record (at oral argument on February 18, 2015) that this mortgage debt was purchased by Extraco in a large portfolio of mortgage debt, and that if this Debtor were the original borrower, Extraco "would not be here" relying on the "privity" argument.)[4]

Consequently, the question before the Court is well-framed, with one exception.  The question ought not turn upon whether a secured creditor and a debtor "are" in privity of contract; rather the issue arises if they "were not" in privity on the petition date.  That is because the Court may eliminate concerns about ongoing privity (and the right to sue upon a Plan default in any appropriate court) by requiring guarantees from the original borrower (DiGiulio), and from "Eagle" and "Zotar" if necessary, as pre-conditions to confirmation.  And all elements of the mortgage note and instrument would have to be reaffirmed and assumed by the reorganized Debtor. And future conveyances without permission of the Court would be declared invalid as a matter of law, etc.  Consequently, the issue should be re-framed as follows: "Does the

---

[4]That concession is the "flip side" of the *Parks* and *Pescrillo* cases cited above.  In those cases the objecting creditors were original lenders opposing efforts by subsequent owners of the land to "cure" the defaults of the original borrowers, and those lenders' objections were sustained.  Extraco here agrees that if the Debtor here were DiGiulio (the original borrower), "lack of privity" would not protect Extraco.

fact that the current mortgagee bought a defaulted mortgage upon land that was no longer owned by the original borrower (a matter of public record) permit the new obligee to block the Debtor (the current owner of the real estate) from its effort to 'modify' the terms of the secured debt under 11 U.S.C. § 1123(b)(5) because the current mortgagee and the Debtor were not in privity of contract on the petition date?"

HOLDING

Because this Debtor owned the subject property, of record, ten months before Extraco bought the loan that was already in foreclosure, Extraco may not now cry "foul" for lack of privity. It is income property, not a homestead.[5] The lack of due diligence that has exemplified such transactions since before the financial meltdown of 2007 and 2008 does not give Extraco greater rights against this downstream owner than the original lender would have against the original borrower. During that economic chaos, "turn-about" in the form of transfers ahead of foreclosure might have been "fair play."

However, after consideration of all of the submissions and arguments, the Court finds that the Plan, currently is, not "fair and equitable" as to Extraco, under 11 U.S.C. § 1129(b). (The Debtor will be given an opportunity to propose a modification.)

---

[5]It appears from the record that DiGiulio lives there, but he may not claim a "homestead" because he does not own the property.

DISCUSSION

First, it is this writer's view that one who buys large portfolios of mortgage debt without diligence as to each debt cannot be heard to complain of lack of privity as to any debtor that seeks relief under the Bankruptcy Code. The creditor might have many valid objections, but lack of privity is not one of them. <u>Lenders</u> have the right and opportunity to meet with a <u>borrower</u> and negotiate terms, whether they actually assert that right and opportunity or not. But those who buy "large" mortgage debt portfolios pay a discounted price which reflects the risk that some loans like this loan might be in the batch. *(Parks* and *Pescrillo* are distinguished on that basis. In each of those cases the objecting creditor was the lender/mortgagee, but relief before this Court was sought by a downstream owner, not the borrower.)

The argument that Extraco "cannot" sue the Debtor (because the Debtor is not on the note) and has recourse only to the property is a *non sequitur*. Besides the fact that that seems to be in the nature of Extraco's business, the Court assures Extraco that if the Court does confirm such a Plan, Extraco will be able to sue the Debtor for a breach of the Plan, as explained above. (Privity in the future would be provided by an Order of this Court, as will be the certainty that future transfers of the property will not end up in future bankruptcy or foreclosure proceedings.)

Second, there may be states in which a mortgagor's conveyance of the land in violation of a mortgage instrument is invalid. (Perhaps the "deed of trust" states do not use "mortgages" for that reason.) New York is not one of them. When a

mortgagor conveys title  to a third party without permission of the mortgagee, the third

party takes valid title <u>subject</u>, <u>however</u> to the mortgage lien.  The mortgagor would

remain liable on the debt, and the breach (usually) is an "act of default" triggering

acceleration of the full balance.   (The "due on sale clause.")   As to a new owner who

is a "bona-fide purchaser without knowledge" of a prohibition, the impact might depend

upon whether what was filed with the appropriate County Clerk was the "Mortgage"

instrument only, or a "Note and Mortgage" or "Bond and Mortgage" instrument.  If the

Mortgage instrument was the only instrument filed, the degree (if any) of incorporation

of "due-on-sale" or other acceleration clauses in that instrument might be critical to the

determination of the rights of the new owner of the realty as against the mortgagee or

its assignees.  Extraco, however, has not disputed the Debtor's <u>title</u> even though the

Debtor, as an "affiliate" of DiGiulio, is chargeable with knowledge of everything that

DiGiulio ever knew about this debt.  And so the court assumes that Extraco accepts

that there is no cloud on the Debtor's title.[6]

      Does the fact that title seemingly has been passed among insiders in a

game of "Keep-Away" matter?  In this particular case, it does not.  The fact that this

Debtor owned the property before Extraco bought the mortgage debt was not hidden

from the world.  It was duly recorded ten months before Extraco's purchase of the loan.

If DiGiulio and his affiliates were playing "Keep-Away," Extraco was not the target;

---

[6]See footnote 3, *supra*, and note that the mortgage did not prohibit unapproved sales of the mortgage property.

Extraco had not appeared on the scene before the Debtor held title.

Based on the submissions to the Court, Extraco seems to be arguing that it enjoys something in the nature of a right to claim "the victimhood" which one or more of its assignor(s) might have claimed at various points in time.   After the lessons learned by the secondary and derivative mortgage markets during the years 2007-2010, there can be no doubt that when Extraco bought the portfolio in 2011, it got what it decided was an appropriate discount from the face value of a "large" portfolio of mortgage loans.   That discount fixed the price of a portfolio that included non-performing loans, whether because of less-than-creditworthy borrowers, or properties that were intentionally over-valued by commissioned loan representatives and appraisers, or real estate investors  who found a niche here and there by "dodging" the lenders and those who bought debt from lenders.

Extraco seems to invite the Court to invent something like a "D'Oench-Duhme Doctrine" for Extraco's business.  Of course, the D'Oench-Duhme Doctrine assures that certain assets bought by certain purchasers of large portfolios of debt owned by failing banks, and bought through the auspices of certain Federal agencies (such as the FDIC), are "cleansed" of defenses that would be "good" as against the original lender if those defenses are "secret" in the sense that they are not stated in the portfolio.

The Court declines that invitation, and moves on to the cited case authorities.  Only one of Extraco's citations of authority as to the text of the Bankruptcy

Code is worthy of attention - - *In re Clay*, 204 B.R. 786 (Bankr. N.D. Alabama, 1996).

That decision would have rejected this Debtor's effort.  It sensibly reasoned (though not

persuasively, in this writer's view) that when Congress made it clear - - in 1994 - - that

a Chapter 13 debtor may stretch-out a post-petition balloon payment over the life of the

plan (and it became a judicial "gloss" that that also applied to defaulted pre-petition

balloons), Congress did not add the same provision to Chapter 11 even though it did

make other amendments to Chapter 11 to make it more similar to Chapter 13 when a

debtor in Chapter 11 is a natural person.

      The fact that Congress made the path clear for residential homeowners to

resurrect and extend the chance to hold-on to their homes by use of Chapter 13 does

not mean that that path did not already exist in Chapter 13.  The decisions were split.

Statutory clarifications for Chapter 13 cases do not stand for the proposition that what

the Debtor here seeks to accomplish was not permissible under Chapter 11 before or

since the 1994 statutory amendments to both Chapters.[7]  Chapter 11 secured creditors

have more power than Chapter 13 secured creditors have, such as the power to vote.

      This Court chooses to consider Chapter 11 case authorities first, not

Chapter 13 cases.  Extraco argues that *In re Clay* was correctly decided.  A "cure"

must "reinstate" the debt, and reinstatement of a fully-matured debt gets a debtor

---

[7]Consider a different example.  11 U.S.C. § 523(a)(9) excepting certain debts arising from drunk driving  from discharge was enacted in 1984.  That did not mean that such debts were discharged before that.  Rather, the amendment laid conflicting decisions to rest.  At the time of that amendment the application of § 523 to Chapter 11 or 13 cases was in flux.  The fact that it was made clear in 1984 that such debts were non-dischargeable in Chapter 7 does not mean that such debts were *ipso facto* dischargeable in other Chapters.

nowhere because the term has expired.

The Debtor, however, correctly notes that Re *New Midland Plaza Assoc.*, 247 B.R. 877 (Bankr. S.D. Fla 2000); Re *Patrician St. Joseph Partners*, 169 B.R. 669 (D Ariz. 1994); Re *Naugles,* 37 B.R. 574 (Bankr. S.D. Fla 1984); Re *Lennington*, 288 B.R. 802 (Bankr. C.D. Ill. 2003), and Re *Arden*, 248 B.R. 164 (Bankr. D. Ariz. 2000),[8] seem to permit what the Debtor attempts here.  This Court is not prepared to reject that effort as a matter of law.[9]

And so the Court turns to the question of whether the Plan is "fair and equitable" toward Extraco.  Under different circumstances, full payment of the secured claim over ten years with a 4% rate of interest would seem fair enough given that any bad conduct by the Debtor or its affiliates could not have been directed at Extraco.  The last title transfer was accomplished and recorded well before Extraco appeared on the scene.  The Court discerns no *animus* toward Extraco by the Debtor.  The Chapter 11 filing by this Debtor came in the face of a foreclosure sale, and there is nothing unusual about that.  It seems that the Debtor discussed a Chapter 11 filing with Extraco before it filed, hoping for a workout that did not happen.   Apparently the Debtor did not "slink around the corner" to "ambush" Extraco.

However, the background here is a game of "Keep-Away," as noted

---

[8]The Court in *Arden, however,*  also pointed out that the Plan before it had an "absolute priority rule" problem.   So does the Plan here, as addressed below.

[9]It is true that 11 U.S.C. § 1124, in setting-forth what "impairment" means, speaks of reinstating the "original" maturity date, but § 1124 is relevant only to the question of whether a class is "impaired."   No reference to § 1124 is necessary in finding that Extraco's secured and unsecured claims are "impaired."

above.  A Plan that would be "fair and equitable" as to Extraco ought to reflect the facts

(1) that this was initially a $65,000, 15-year loan that presumably was fully-secured at

its inception in 1995; (2) that 20 years have gone by so far, and nearly ten years have

gone by without any payment; (3) yet $112,500 remains due and owing, only $ 69,000

of which is secured; (4) the Plan proposes yet another 10 years; (5) the contract rate of

interest was 12.99%, and the judgment rate of interest has been 9% since entry of

judgment of foreclosure and sale on or about May 14, 2013, but the Plan proposes only

a 4% *Till* rate, and (6) the Plan proposes to pay only 13% of the unsecured deficiency

claim.   It does not seem "fair and equitable," but, more importantly for now, it does not

propose to pay Extraco in a manner that would pass the "absolute priority rule," codified

in 11 U.S.C. § 1129(b)(2)(B)(ii).

             To begin this part of the analysis, the Court notes that this is a two-party

case.  Although the Debtor has other creditors and other properties, has tenants, owes

taxes, etc., it states in its Disclosure Statement that this case was filed solely to

restructure the Extraco debt.  The Disclosure Statement and the Schedules

misleadingly state that all of the mortgage debt on all of the Debtor's properties are

"non-recourse against the Debtor."  That seems to be a contrivance intended to create

the impression that the Debtor is being very "fair and equitable" toward Extraco by

granting it an unsecured deficiency claim upon which 13% will be paid over time, even

though Extraco's claim is "non-recourse."

             "Non-recourse" is a term of art used in connection with some secured loan

transactions.  It means that the lender has agreed to look only to the collateral for

enforcement of the loan, and that the lender will not assert any *in personam* liability

with regard to the borrower.   In fact, the mortgage interest held by Extraco does not

arise out of a "non-recourse loan."  Rather, what the Debtor really is saying is the

opposite  side of its own "privity" argument.  The Debtor vigorously <u>opposes Extraco's</u>

<u>argument that there is no privity</u>, the Debtor arguing that the note and mortgage

recognized that there might be downstream owners of the real estate, on the one hand,

and of the note and mortgage on the other hand.  <u>But the Debtor denies that Extraco</u>

<u>has any "recourse" against the Debtor</u>, and so Extraco must look only to the real estate.

So the offer of 13 cents on the dollar as to the deficiency is by the Debtor's grace.

Such a stance is inconsistent and disingenuous.  The Court finds that the Plan must be

viewed as giving Extraco an unsecured deficiency claim as a matter of right, not of

grace.

  The result is this.  Extraco now controls the vote of the general unsecured

class because the Debtor cannot win two-thirds in amount of that class of claims

without Extraco's consent, yet the Debtor proposes to retain ownership of the property.

That is unconfirmable under the absolute priority rule.  (11 U.S.C. § 1129(b)(2))

  How the Court might rule in a case that is similar, but in which the objector

would not control the unsecured class, will be left to another day.  For now, the Court

will only express a view (not a holding) that the path of least resistance toward

confirmation of a Chapter 11 Plan proposed by a Debtor who owns mortgaged land that

has been transferred among insiders in a game of "Keep Away" from various successive buyers of the portfolio that includes a loan such as that in question, would be to offer to assume the debt in full, to provide guaranties upon the debt from intervening insiders, to propose contract rate of interest (or judgment rate where, as here, there is a judgment of foreclosure and sale) on the secured portion of the debt, and to provide negotiated satisfaction of the unsecured deficiency claim in a reasonable time frame.  That would be the "path of least resistance," but not necessarily the only path to confirmation.  Much that is presented in the facts and nuances of this case might evolve in this or other cases.

Extraco's Objection to the Debtor's Plan is sustained without prejudice to the Debtor filing an Amended Plan within 21 days.  Extraco's Motion to Lift Stay is continued to July 1, 2015 at 10:00 a.m. in order to consider any Amended Plan that the Debtor might file.

SO ORDERED.

Dated:      Buffalo, New York
            May 20, 2015

                              s/Michael J. Kaplan
            _____
                              U.S.B.J.